Thank you. May it please the Court, I'm Andrea Harris with the Federal Defender's Office in Charlottesville. I'm here with my colleague Christine Lee on behalf of Mr. Slocumb. So this is sort of an instant replay. Exactly. I saw Judge Agee yesterday morning in Charlottesville. In this case we raised three issues. I'm going to focus on the first issue, which I think is potentially dispositive. And that issue is that the investigative detention... I don't want to give the advantage to you. There's a lot of noise in there. We're trying to make sure that you can hear me. Thank you so much. Thank you. As I was saying, the first issue in this case is whether the investigatory detention, the seizure of Mr. Slocumb was justified by reasonable or articulable suspicion of criminal activity. And in this case, although the District Court recognized that this was a very close case as to whether law enforcement had reasonable suspicion of criminal activity to detain Mr. Slocumb, the court erred in ruling that they did because the facts cited by the government don't allow the reasonable conclusion that Mr. Slocumb himself was involved in any criminal activity. There must be, of course, a particularized and objective basis for suspecting that the person's involved in criminal activity. Most of the facts that were cited by the government were context-based facts that weren't particular to Mr. Slocumb. Obviously, it was late. It was a high-drug crime area. He was in the parking lot of a closed business. These factors would have applied to anybody who would have been in the area at that time of night. Now, obviously, those factors can contribute to the totality of the circumstances when the court and law enforcement are making the analysis. But the second set of factors that are cited by the government as particular to Mr. Slocumb aren't...they're summarized by the court as being evasive. Mr. Slocumb appeared to be hurrying his companion, Ms. Lewis, along. He gave low, mumbled responses to his questions. He kept his head turned away, and he attempted to avoid eye contact. And then the court further found that this evasiveness was seemingly inconsistent with his reason for being in the lot, which was that he had broken down. And the court suggested that a person whose vehicle had been broken down would have been more happier to see the police in that occasion, and that that evasiveness was inconsistent with that. I would suggest...well, one thing I would sort of point out with regard to the presence of the police, this wasn't a situation where Mr. Slocumb and his friend were dealing with a broken down car, and a patrol officer rolled by and sort of inquired what was going on, and could he get some assistance. This was a situation where they were in a parking lot. They had two or three vehicles loaded with 10 to 12 police officers. Armed police officers jump out and move quickly towards this house that they were conducting a search operation in. There were several of the officers, two to five of the officers had long machine gun type of weapons. So this was a situation that was a far cry from just a regular patrol officer on the beat sort of rolling by and inquiring. So I think that's a significant factor to note in this analysis. The two arguments I would make, number one, I would suggest that Mr. Slocumb wasn't evasive at all. He might have mumbled and he might not have looked directly at Lieutenant Chilton when he was asking him questions, but he responded to his questions. At this point, the government argued that this is just a consensual encounter between Mr. Slocumb and Lieutenant Chilton, and I think it was completely reasonable for Lieutenant Chilton to stop and inquire and figure out what they were doing there, both in light of the fact that he and his family were involved in a serious law enforcement operation in the house across the street, but also based on the fact that he had gotten reports from Mr. Bates, whose property it was, that he had been concerned about drug activity in the restaurant. So I think it was certainly reasonable for Chilton to stop and just check out and see what was going on. But during that consensual encounter, Mr. Slocumb, according to Florida v. Royer in those days, should not be used against him as a factor that suggests he was involved in some criminal activity, whereas if he had just decided not to answer at all, wouldn't necessarily have been able to be used against him. Importantly, he didn't flee, he didn't attempt to flee, he didn't turn and try and walk away from the situation. He stayed there, he answered Lieutenant Chilton's questions, and he was not affected or corroborated by the physical conduct that Lieutenant Chilton was able to observe. The second argument I have is that the conduct wasn't evasive in a way to support suspicion of a crime. Obviously in these stop cases, they're also fact dependent, and so I've been looking through all the cases to try and see if I could find a case that had facts very similar to this, and of course, that's never going to be the case. The facts are always slightly different. But when I looked at the cases that talk about evasiveness as a factor weighing in favor of a stop, the cases all included either clearly more evasive conduct or actually evasive conduct, where there's flight or the person turns and walks away, or there were, in addition to that, more suspicious facts. So for example, Bumpers is a case where clearly the defendant immediately began to walk away at a fast pace when the law enforcement arrived. Illinois v. Wardlow, that's the headlong flight case. I mean, that's not what we're dealing with here. In U.S. v. George, which is a case from this court in 2013, there was a failure to make eye contact, which contributed to the reasonable suspicion. But in that case, in addition, the defendant held up his ID to the window of the car and turned his head away, and then he also had his hand down by his thigh, where the officer couldn't tell whether he might have had a weapon and he might have been armed, and it could have been a situation where there was an officer safety issue. So there were extra factors aside from just whatever might have been construed as nervousness that would point to particular criminal activity. Ms. Harris, I think you recognize that context matters. You're going through the factors that deem that to be relevant. And I guess I would agree if the officers had come upon this defendant on a street, otherwise innocuous street, where nothing else was going on, but he was right across the street from a drug house in the middle of the night. Doesn't that context matter here? I think it does matter, and that's why I think it was perfectly reasonable, and it would have been irresponsible if Lt. Chilton hadn't gone to inquire to figure out what they were doing, why they were there. But what he hears is, Ms. Lewis's car broke down. He borrowed the landlord's car to come get her. There were two cars there, and Lt. Chilton testified that clearly they were moving items from the Cadillac to the smaller car, moving the child's car seat. There was a child present. So what he witnessed corroborated what he had been told as their actions in the area, and it's even more unfortunate that it happened to have happened shortly before the police were getting ready to engage in an execution of a search warrant across the street. So that being said, I think it's certainly reasonable for Lt. Chilton to have gone over to figure out what was going on, and perhaps it would have been justified in an initial detention right at that point that he goes over there, but that's not what happened. And once he is able to basically dispel his suspicion, then perhaps, and there's not any testimony as to what particular crime he's suspicious of, but I think it's clear that because Mr. Bates, the owner of the property, had expressed concerns about drug activity in the parking lot, and the area is well known for that, certainly that's the suspicion. But when he goes over there, there's nothing else about their encounter that suggests that there's criminal activity going on. And clearly what they're doing, and I think Lt. Chilton says it was obvious they were moving from the one car to the smaller car. And so that's why, of course, context does matter, but you can't ignore the facts that dispel any suspicion that might have originally been in his head. I think I would suggest the facts in this case are much more similar, and again, there aren't any cases that are exactly on point, but are more similar to some of the cases where this court has found that there wasn't reasonable articulable suspicion, and Sprinkle being sort of one of the very early cases. In that case, I think the officer testified that he witnessed Mr. Sprinkle get into the car, and he sees the two men huddled by the console of the car with their fingers together. He doesn't see any drugs passing or anything like that, but that by itself seems a little bit more suspicious than what Lt. Chilton obviously observes. Massenburg's another one where there's a report of gunshots in the area, and the officer stopped these four individuals. At least one of the individuals agrees to a pat-down, but then when Mr. Massenburg says, no, I don't need you to pat it down, and at that point he becomes nervous and fails to make eye contact, that seems a little bit more similar to the case of Mr. Slocum. And again, I don't think there's any reason for that. It's certainly normal that a person would be nervous in that situation. You just saw ten heavily armed officers going, and I'm quite sure they're getting ready to execute a search warrant. They had their game faces on, and they would not be people that you would want to really get in the way of. So that by itself would make you nervous. Being out there in that area late at night, you would want to be in a hurry to get out of there if you were going to just pick somebody up whose car had broken down. So I think this issue is dispositive, because of course he is detained, they are detained after that, and then what follows from that is Officer Grant then getting information about his identity, which sort of checks out. I mean, the name he gets and he runs it, it checks out. But ultimately, confronted with conflicting names, they arrest Mr. Slocum for a false identity. The key there is that if he wasn't lawfully detained, there's no probable cause for that crime. The first element of that offense relates to somebody who's been lawfully detained. And then just very briefly on the apparent authority issue, whether Ms. Lewis had consent to search, to authorize the search of the vehicle at the very end, I would suggest that the facts that were present to… If we assume, just for argument, that you were unsuccessful on your initial claim about the detention, but there was no reasonable basis to conclude there was apparent authority, would that satisfy the need for reversal vacation? Well, if there was no apparent authority, then the evidence that was found in the vehicle would be suppressed, and that's essentially the heart of the case. The evidence that was presented to Officer McKnight at the time that he asked Ms. Lewis for consent, and this is of course after Mr. Slocum is arrested and placed in custody in the police vehicle, is ambiguous at best. And so I would suggest that a person of reasonable caution wouldn't have felt comfortable that she had authority to authorize the search of the car. There were two cars there. There were two adults there. She clearly indicated that she knew what was in the Cadillac. She didn't know what was in the Honda. A person of reasonable caution would have asked the follow-up question, probably just one question, whose cars are those, to determine whether she had authority to consent to that vehicle. And I think because the evidence presented to Officer McKnight, and Officer McKnight didn't know what all these other officers knew at the time that he conducts his search, and I would suggest that what he knew at that time was not enough to give him reason to believe that Ms. Lewis had the authority to consent to the search of that vehicle. And if there are no further questions, I'll reserve the rest of my time for rebuttal. Thank you. Thank you. Hudson. Good morning. Jeanne Hudson for the United States. Your Honor, in this case, as Judge Diaz pointed out, context matters, and context really was a large part of the court's reason. I have to say, there's not much context here that, to me, matters. This case is, to me, far different from any of the cases where we were on the line between reasonable suspicion and not. I think it's fairly unique, but I would press the point that context matters, and there is a lot of context here, from the government's perspective anyway. I want to start with just the observation that I think we all understand, but I think it bears emphasizing, that under these circumstances, at the outset, this contact initially with Mr. Slocum was inevitable. The police officers, as the record shows, are in this line approaching a target house to execute this drug, the search warrant. The house is almost directly, not quite direct, there's one house that's a bit closer to directly across from the parking lot. If you look at the aerial photograph, the target house is just to the side of that, but almost, as the record reflects in the testimony, directly across from this parking lot. When this line of police officers, who were there for the express purpose of executing the search warrant, are moving in a direct line to that target house, and they find Mr. Slocum and Ms. Lewis, and the two vehicles, not only in the parking lot, but in the parking lot, in the front two parking places, closest to the street, very close to the target house, it is inevitable. They're not going to just walk by them. They're not just going to say at midnight, on the way to this house, when these two people are that close to the house, and especially with the particularized knowledge that they have, that this particular parking lot is associated with that target house, for the specific reason of being involved with drug transactions, with drug trafficking. And not only knowing it, but knowing that the owner of the parking lot has specifically complained about that usage, and not only are the police officers who might, on any other night, be generally aware of those facts, which would be significant on any night, but on this particular night, they're at the parking lot, heading towards that house, to execute the warrant. So, with these two people, in that location, under these circumstances, with their knowledge, it was inevitable that they were going to make some contact with Mr. Slocum. So, I agree with Ms. Harris, to the extent that she says this is very unlike a beat cop on the street, or I think maybe the court just referred to that a moment ago. It is very different from a police officer who's just walking down the street otherwise, and comes upon a person. These are very particular and maybe unique circumstances, under which we would suggest, for a couple of reasons, that contact was inevitable. Even, if only, to make sure these people are identified for their safety, for police officers' safety. These police officers don't know if they were there for lookouts. They don't know if they just walked past them. Are they going to make a phone call to the target house to let them know the cops are on the way to execute this warrant? They were not going to walk past Mr. Slocum. It was just inevitable. I don't think Ms. Harris disputes that. I guess the question is whether or not the seizure was inevitable and or, more importantly, proper. Well, my argument that I just summarized, Your Honor, was really in response to Mr. Slocum's argument, Ms. Harris' argument, that the conduct here had really nothing to do with Mr. Slocum's conduct very much. I mean, I think she's making the point that, you know, what did he do other than innocent conduct, you know, moving a seat from one car to another? And my point is that it's just not as simple as that. This contact with Mr. Slocum would have happened, at least at the outset. Then, on top of all those facts, when you add the evasive behavior, not looking at him, not making eye contact, mumbling responses, turning his head as though he doesn't want to have any face-to-face contact with this police officer, under those circumstances, it's particularly difficult. I mean, there's a platoon of police officers there. And I don't, I suppose one could say it's not at all unreasonable for someone to shy away from police contact in that context. Well, I think that in this particular context, especially understanding the story that was given, that these are two people broken down, I think that the court was correct in concluding that a more reasonable viewpoint would be that someone who was broken down at midnight, coming to pick up his girlfriend, who also has a baby here in this late, in a commercial parking lot, would maybe have welcomed the police there to help them in that situation. Maybe have welcomed the beat officer, but a platoon of officers armed to the teeth, that's a whole different story. But only one officer, only Chilton stopped to talk to them. The other officers proceeded on to the house. So only the one officer engaged Mr. Slocum there initially at that first contact. So certainly, I don't doubt that Mr. Slocum and Ms. Lewis saw the other police officers coming across the lot, but only Mr. Chilton initially engaged them. So in that context, we think that the court was clearly correct in concluding that there was reasonable suspicion. Okay, so maybe there's some support for the issue of the defendant being evasive, but what is it about his story to the police that makes no sense? It looks like what he said about the car being broken down and his moving the child in a safety seat to the other vehicle, all of that seems to be consistent with what the officer would have observed at that scene. I think that's right, and I think the court recognized that, and I don't think the record reflects, my reading anyway, doesn't reflect that the officers actually thought the story was suspicious in and of itself. I don't think anybody's saying that it looked suspicious that he was moving a car seat. There's a child there on the scene. So then all you've got is evasiveness. Is that enough? Well, we think it is. Judge Conrad thought it was. We think that, again, in context, it's not just evasiveness. It's evasiveness of a person who has a child in a car seat who's apparently in need of assistance. The woman was there with her child, called her boyfriend to come help her. Why would there otherwise be a need to be evasive for this officer who's just come up under these circumstances? I think if it were me, I'd be concerned. I would want to ask if I can give you my identification, whatever the questions the officer would have. I can't imagine somebody who was in that particular compromised situation would be. Well, I mean, does Flokum have an obligation to engage with these officers? He doesn't. He doesn't, and again, this is why the overall context, I think, is unique and unusual. We think the judge got it right. We think that Mr. Flokum's behavior, especially in comparison to the story that he had, which otherwise would appear legitimate, I think that's really the underpinnings for why the evasive conduct was so significant to the court in this case. Did the police officer say, sir, can I help you with your child? I don't think that's in the testimony. Well, if you had those kind of facts, it might be kind of interesting that he didn't welcome them. But instead it was, who are you? Give us this. Give us that. It's amazing how it seemed that if you're about to raid a house and you see two citizens with a baby, the first thing you would say, wait a minute, you're in the wrong place right now. We need to get you out of here. Stay put or get out of here. Instead it was they diverted at least a part of the force to him and asked him. He became the call celeb. And you question why he would be nervous about a situation like that? He didn't come to him saying, sir, we're here to help you to protect and serve. It was all, who are you? And he wanted to get back in the car. It seemed to me, I can't understand that. If there's about to be potentially shooting and an innocent citizen says, can I get back in my car? He says, no, you have to stand out here. Does that make any sense to you? It does to me, Your Honor, in that, yes, Your Honor, because the police officer, I think the court's viewpoint there was expressed from the assumption that this was an innocent person. The police officer doesn't know. It could be either one. This is the situation that police officers are in, and especially in these circumstances where they are in the midst of this approach to a house. The police officer doesn't know. It could be an innocent person. It could be somebody who's associated with the house. He doesn't know. And the police officer goes up, and Chilton's testimony is his initial contact was less than a minute. He just says, I think his testimony was he went to ask what were they doing here and questions like that. His testimony is unclear even to the extent of whether or not he specifically asked Mr. Slocum for identification because I think the question that was posed to him was in the first or second contact. Did the defendant produce an identification? It's certainly clear that when Chilton leaves and goes on into the house, he feels like he's got to go ahead into the house with his team there, at which point the court knows he calls Grant. But Chilton doesn't know yet who this person is even. Is he associated with the house, or is he an innocent citizen? He can't make that assumption. He can't make the assumption without at least finding out who this person is. In the government's view, he can't. Well, after they do the raid, they come back. What makes the search by the officer who searched the Honda, why was that reasonable for him to believe he had a parent, that there was a parent authority residing in the woman to grant him authority to search the car? Well, I think Mr. Officer McKnight is the officer who searched the Honda, and he's the only one there of the officers, if I'm remembering correctly. Chilton's. Well, wait a minute. Sorry. The other officers had seen, certainly Lieutenant Chilton had seen, Mr. Slocum drive that car to the lot. No, sir. Right, he didn't? No. Didn't he say that he drove the car? He was the one who had the keys? Who had the keys was not established. I believe the record is clear that none of the officers saw Mr. Slocum drive the Honda. Mr. Officer Chilton testified that both Slocum and Ms. Lewis both told him that her car had broken down and that he had come to pick her up in the Honda. So they all, with the exception of the officer who did the search, they all knew that that's what he had said? That was Lieutenant Chilton, Judge, who said that he heard those stories from Lieutenant Chilton, who's the first officer on the scene. If Lieutenant Chilton, with that knowledge, had searched the car, would that have been a reasonable conclusion, that she had apparent authority to let him search the car? If Chilton had searched the car, understanding that both of them had said that he drove the car there. Well, the rest of that statement was that he drove the car there, that it was the landlady's car, and that they, and I think at least in one point, she, had permission to drive the car home. So I would say yes. But that's not what happened. And, in fact, although Chilton... Why wouldn't it be unreasonable, almost per se, not to ask, well, whose car is this? It's an interesting record in that regard, Your Honor. Nobody... Well, there is a part in the record where they are clear that they understand. There is no testimony specifically on this other than... Is this the police or Mr. Slocum and his friends? The police. The police understand that the car belongs to Ms. Ross. So they at least, the record at least reflects their understanding that the car belonged to Ms. Ross, the landlady. And Chilton's testimony is clear that both Slocum and Lewis told him that the car belonged to the landlady and that the landlady had given them permission to use the car to drive home. And it was always in reference to both of them. But McKnight was not informed of that story. I think that became clear at the second part of the suppression hearing. McKnight, who did the search, was not aware of that story. He had talked to Lewis. He knew from Chilton... Was Chilton present when McKnight did the search? Chilton said he was there, but he did not hear McKnight's conversation with Lewis, as I understand it. So McKnight understands from Lewis that she has said... Sorry, McKnight has talked to Chilton and understands that Lewis gave the name Hakeem. McKnight himself said that he remembered then that they were aware of a suspect named Hakeem from Georgia who was a suspected narcotics dealer in this area. He asks Lewis whether she knows whether anything is illegal in the car. She says there's nothing in the Cadillac. She's unsure about the Honda. McKnight asks Lewis where Hakeem was in the car. She points to the passenger seat. His testimony is that he observed the car seat in the back of the car and understood that she was driving there. He also said that when he first got there, he saw a child... She was driving... The Honda. And because... Primarily, he assumed that. He said he assumed it. That's exactly what he said. In part because of what she said where he was, that he was in the passenger seat of the Honda, right? I think in large part because of that. I think the other piece of that was because there was a baby seat in the car. He said that he had seen a child there when he first saw the people there, but at the time that she gave his consent, he didn't remember whether the child was in the car. But he was clear that he saw a child when he got there, so I think that was another part of it. And the other piece that is, I think, significant here is that he also knows that the defendant has been detained when he talks to Lewis. So I think there's some support there for the conclusion that she's the only one who can drive that car when the defendant is detained. She is the only driver. She's got this baby. Somebody's going home with the baby. Somebody's driving the car away. So I think for those reasons, the court got that issue right as well. Before I leave, I wanted to just make one clarification that I had informed counsel of before. There was a mistake in our brief in the section on the factors that support probable cause to arrest. We had listed the factor that Ms. Lewis had stated that Mr. Slocum's name was Anthony Francis, and I think the record is clear on that. But the mistaken part was that we included the additional statement that she made post-arrest that she had, I'm sorry, the correct statement was that Ms. Lewis said that she knew this individual by the name Hakeem Jones. I said also, in support of probable cause to arrest, that she stated that she had never known him by the name Anthony Francis. My clarification is that I think the record is clear that she didn't know him by Anthony Francis when she stated that his name was Hakeem Jones. But I would not rely on the factor that her post-arrest statement, which was specifically, I have never known him by the name Anthony Francis. I just wanted to make that clarification. You concede that if we find that the stop in this case was illegal, that that ends the case? We don't need to address these other issues? Yes, sir. Okay. And that's so even though Mr. Slocum was arrested for giving a false identification, in some instances a subsequent arrest for a crime would purge any taint. But in this case, as Ms. Harris pointed out, one of the elements of that offense is that there has to be a lawful detention to begin with, so there's no question about any subsequent arrest purging the unlawful stop in this case. You didn't raise that. I just want to be sure that that's not an issue here. And I apologize, Your Honor. I'm not prepared to fully answer that question. I didn't hear anything today that caused me to disagree, and I hate to leave with an I don't know, but I'm not really sure of that answer entirely. I don't think this is in the record, but was Mr. Slocum prosecuted in state court for giving the false information? I don't know the answer to that either, Your Honor. I'm sorry. Anything further? Thank you. Thank you, counsel. I just have a couple brief follow-ups. With regard to the detention, the government seemed to be suggesting that Lieutenant Chilton could detain Mr. Slocum because he didn't know if he was an innocent person or not. And I would suggest that they can't detain him just to find out if perhaps he was involved in some criminal activity. At the time that they detained him, Lieutenant Chilton had asked him why he was there, and he told him, even though he wasn't very enthusiastic about talking to him, he told him that he was there because of the broken-down car, and what he witnessed corroborated that. And so I think at that point, he has to be able to point to some facts that suggest criminal activity on the part of Mr. Slocum beyond that, and just wondering is not enough. With regard to the apparent authority, and Judge Agee's questions sort of reminded me of this, all of the cases that the district court cited in support of the apparent authority were cases where they were driving cases where the officers actually saw the first driver in the vehicle, but then there was some question about, well, the person wasn't listed on the rental, it was a leased vehicle, and they weren't listed on the rental agreement, or the car was registered to somebody else, and the owner of the car was a passenger in the vehicle. But in all of those cases, the law enforcement officer actually witnessed the person driving, and that's a significant factor that's absent here. You mean the person who gave consent. Right, exactly. And that's absent here. Not only did none of the officers see anyone driving, there were a lot of assumptions made during the suppression hearing as to who drove and how they got there, but there wasn't any definitive answer about that. The testimony at the hearing was that nobody knew where the keys were. There was a supplemental hearing related to whether the collective knowledge doctrine might be applicable to be able to aggregate what Lieutenant Chilton and Officer Grant knew, and that sort of thing later. At that subsequent hearing, it came out that the keys were just in the ignition of the Honda, and I think there's a picture that was entered into evidence at that second supplemental suppression hearing. So there wasn't anything. Under the collective knowledge doctrine, would Lieutenant Chilton's knowledge of the statement by Mr. Slim and his friend as to which cars they drove, would that be imputed to the officer who conducted the search? No, because Lieutenant Chilton didn't direct the search, and that was the purpose of that second supplemental hearing, and that transcript of that supplemental hearing is in the appendix. And it was specifically for that purpose. The court had issued sort of an interim memorandum in order, but wanted some additional evidence. So the officer who did the search was proceeding on his own? On his own, and he testified that he didn't know whose cars they were. In fact, none of the officers that testified at the hearing knew. They all sort of thought that the plates had been run as to who the vehicles actually belonged to, but none of them could actually say that it actually had been done. They all sort of thought it had been done at some point. They didn't know when, whether it was after this. But none of them could say that at the time they requested consent to search that in fact anybody had run the plates to figure out whose cars they were. But Officer McKnight in particular said that he didn't ask whose car it was, he didn't know how they got there, he didn't know. And I think critically about Officer McKnight saying, one of the things he relied on was that Miss Lewis said that Mr. Slocum had been sitting in the passenger seat. Officer McKnight saw the individuals there in the parking lot standing, I think he testified he saw them standing at the back of the two cars when he first went into the house to execute the search warrant. So he knew that these people had been there for some period of time because he didn't come out until sometime later. Lieutenant Chilton was in the house for 8, 9, 10 minutes and then McKnight came out sometime after that. We don't know exactly when, but sometime after that. So he knew that these individuals had been there for a long time. So he didn't ask when Mr. Slocum might have been sitting in the car, was he sitting in the passenger seat while they were waiting for the police to come back out from the house, or is it because the landlord drove him over there, or is it because Miss Lewis was driving the car? I mean, it's really just very speculative at this point. And as I argued earlier, there weren't any follow-up questions to clarify what was an ambiguous situation. Thank you. Thank you very much.
judges: Roger L. Gregory, G. Steven Agee, Albert Diaz